UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANWAR CHITAYAT,

               Plaintiff,

    -against-                              **MEMORANDUM & ORDER**

VANDERBILT ASSOCIATES, a Partnership,       Civil Action No.  03-5314
and BARBARA GROSS as EXECUTRIX           (DRH)(MLO)
of the ESTATE of WALTER GROSS,

               Defendants.
------------------------------------------------------------X
BARBARA GROSS as EXECUTRIX of the
ESTATE of WALTER GROSS,

               Third-Party Plaintiff,

    -against-

THOMAS F.  MANNO REVOCABLE TRUST
U/A 13th DAY OF FEBRUARY 1990,
WILDORO ASSOCIATES, CHARLES ROSE,
and ELIZABETH BOINOTT, as Administrators
of the Estate of HOWARD ROSE,

               Third-Party Defendants.
------------------------------------------------------------X
BARBARA GROSS as EXECUTRIX of the
ESTATE of WALTER GROSS,

               Third-Party Plaintiff,

    -against-

PALL CORPORATION, VANDERBILT
GENERATION L.P. and VANDERBILT
GENERATION II CORP.,

               Third-Party Defendants
------------------------------------------------------------X

**Appearances:**

**Certilman Balin Adler & Hyman, LLP**
Attorneys for Plaintiff Anwar Chitayat
90 Merrick Avenue
East Meadow, New York 11554
By:    Candace Reid Gladstone, Esq.
       James Rigano, Esq.

**Sive, Paget & Riesel, P.C.**
Attorneys for Defendant/ Third-Party Plaintiff Estate of Walter Gross
460 Park Avenue
New York, New York 10022
By:    Daniel Riesel, Esq.
       Dan Chorost, Esq.
       Ashley Miller, Esq.

**Tannenbaum Helpern Syracuse & Hirschtritt**
Attorneys for Defendant Vanderbilt Associates and Third-Party Defendant Wildoro Associates
900 Third Avenue
New York, New York, 10022
By:    John-Patrick Stiles Curran, Esq.

**Wilmer Cutler Pickering Hale and Dorr LLP**
Attorneys for Third-Party Defendant Estate of Howard Rose
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
By:    Daniel H.  Squire, Esq.

**Bond, Schoeneck & King, PLLC**
Attorneys for Third-Party Defendant Pall Corporation
One Lincoln Center
Syracuse, New York 13202
      and
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
By:    Thomas R.  Smith, Esq.
       Robert R.  Tyson, Esq.
       James P.  Clark, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Anwar Chitayat ("Plaintiff" or "Chitayat") commenced this action in 2003 pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., as well as state law[1], seeking to recover response costs incurred in the remediation of tetrachloroethene ("PCE") and other contaminants at 100 Oser Avenue, Hauppauge, New York (the "Oser Site"). The Oser Site is located within the Hauppauge Industrial Park and occupies approximately two acres of land.

Presently before the Court are two motions in limine by Third-Party Defendant Pall Corporation ("Pall") who is the owner of the property at 225 Marcus Boulevard, Hauppauge (the "Pall Site"), which is also located in the Hauppauge Industrial Park. The Pall Site is approximately 200-300 feet southwest hydrogeologically and immediately upgradient of the Oser Site. One motion seeks to preclude the testimony of Dan C. Buzea ("Buzea"), an expert retained by Defendant/Third-Party Plaintiff Barbara Gross, as Executrix of the Estate of Walter Gross ("Gross"). Gross intends to call Buzea at trial to testify concerning the relative responsibility of the parties for contamination at the Oser Site and the appropriate allocation of liability for the response costs at issue. The other motion seeks to preclude the testimony of Dr. Thomas E. Pease, PE ("Pease") an expert retained by Chitayat. Chitayat intends to call Pease to testify at trial concerning, inter alia, Pall's contribution to the contamination in groundwater at the Oser Site and whether or not the response costs in remediating the Oser Site were reasonable, necessary, and consistent with the National Contingency Plan ("NCP"), 40 C.F.R. § 300 et seq.,

---

[1] The amended complaint asserts a claim for joint and several cost recovery pursuant to § 107 of CERCLA, a claim for contribution pursuant to § 113(f) of CERCLA, a declaratory judgment claim under CERCLA, and a claim under state law for restitution.

as required by CERCLA.  For the reasons set forth below, the motion as to Buzea is granted in part and denied in part and the motion as to Pease is granted in part and denied in part.

**I.  Relevant Legal Principles**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Rule 702 "embodies a liberal standard of admissibility for expert opinions . . . ." *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005).  The Supreme Court has made clear that a district court has a "gatekeeping" function under Rule 702 and must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993).  "In gauging reliability, the district court should consider the indicia of reliability identified in Rule 702 . . . ." *Willis v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004).  The three indicia of reliability set forth in Rule 702 are not, however, exhaustive.  "The district court may consider a number of other factors . . . including: (1) whether a theory or technique had been or can be tested; (2) 'whether the theory or technique had been subjected to peer review and publication;' (3) 'the technique's known or potential rate of error' and 'the existence and maintenance of standards

controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Id.* (citing *Daubert*, 509 U.S. at 593-94). "Although expert testimony should be excluded if it is speculative or conjectural, . . . or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, . . . other contentions that the assumptions are unfounded go to the weight, not the admissibility of the testimony." *Boucher v. United States Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir. 1996) (internal citations and quotations omitted). *Accord McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).

A district court has broad discretion with respect to the admissibility or exclusion of expert evidence. *McCullock*, 61 F.3d at 1044. That the court will be the trier of fact affects both its discretion and its gatekeeping function. Greater deference is granted to a court's determination of relevance in a bench trial because the court is "presumed to be able to exclude improper inferences from its own decisional analysis." *George v. Celotex Corp.*, 914 F.2d 26, 28 (2d Cir. 1990). Similarly, a court has greater flexibility in satisfying its gatekeeping function vis a vis expert testimony where it is the trier of fact given the absence of the need to protect juries from dubious expert evidence. *See, e.g., New York v. Solvent Chem. Co.*, 2006 WL 2640647, at *1 (W.D.N.Y. Sept. 14, 2006); *American Home Assur. Co. v. Masters' Ships Mgmt., S.A.*, 2005 WL 159592, *1 (S.D.N.Y. Jan. 25, 2005). *Cf. Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000) (explaining that where district court is the trier of fact, it has greater flexibility in admitting proffered expert testimony and then deciding during the course of the trial whether the evidence meets the requirements of *Daubert* and deserves to be credited).

With these principles in mind, the Court shall now discuss the proposed expert testimony and the proposed bases for exclusion.

## II.  The Buzea Testimony

### A.  Buzea's Qualifications

According to his curriculum vitae, Buzea holds a Masters of Science degree in geology and is certified as a Professional Geologist by the American Institute of Professional Geologists. He is a member of the Geological Society of America, the American Institute of Professional Geologists and the Association of Ground-Water Scientists and Engineers.  He has extensive experience in the fields of hydrogeology and environmental remediation, including a number of projects involving ground water contamination and remediation on Long Island.

### B.  The Nature of Buzea's Testimony

Buzea begins his report with a description of the Oser Site and its use history, including its lease to Sands Textile, a textile manufacturer which used PCE to dry clean finished textile products, and its use by Anorad, a company owned by Plaintiff, which manufactured technical rotational positioning equipment.  Next, he discusses the geology and hydrogeology of the Oser Site and its immediate vicinity and sets forth the hydrogeologic parameters relied on in his report.[2]

The report then turns to contaminant characterization and source evaluation.  The primary contaminants of concern consist of PCE, carbon tetrachloride, methylene chloride, and toluene,

---

[2] According to Buzea, these same parameters are listed in a Pall report entitled Remedial Investigation Report, Pall Rai., Inc., May 1993 by C.A. Rich Consultants, Inc.

all of which are volatile chemical compounds ("VOCs"). As described in the report, PCE is a manufactured chemical compound widely used for dry cleaning of fabrics and for metal degreasing; carbon tetrachloride is a synthetic chemical compound whose industrial uses include the production of chlorofluorocarbons used in refrigeration and as a degreasing solvent; methylene chloride is a chemical compound used as a solvent in paint removers, degreasing agents, and aerosol propellants; and toluene is a chemical compound widely used as an industrial feedstock and as a solvent. Of the four compounds, carbon tetrachloride is the most toxic with a health hazard rating of severe; the other three compounds have a moderate health hazard rating. With the exception of toluene, the compounds have carcinogenic health effects associated with them. The water solubility of all four compounds indicates that they are readily absorbed into the groundwater table. Based on their chemical properties, methylene chloride and carbon tetrachloride are more difficult to remove from soil and ground water using a soil vapor extraction or other similar remedial technologies. With respect to source evaluation, the report examines both on-site and off-site sources.

In evaluating on-site sources, Buzea examined various reports and documents and concluded that sufficient documentation existed to conclude that Sands Textile used PCE during its operations. However, the absence of documentation of the use of carbon tetrachloride and methylene chloride and/or toluene by Sands Textile led Buzea to conclude that Sands Textile was not the source of these contaminants.

Turning to off-site sources, Buzea evaluated the Pall Site, as well as six industries located upgradient of the Oser Site in the Hauppauge Industrial Park. The report specifies that the various documents analyzed indicate that (1) Pall used hazardous materials in conjunction with

its operations including PCE, carbon tetrachloride, methylene chloride and toluene; (2) Pall repeatedly discharged these contaminants through leaking underground storage tanks as well as several onsite leaching pools; and (3) the existence of two contaminated groundwater plumes on the Pall Site consisting primarily of the four above-mentioned contaminants. Buzea opines that based on the predominant direction of groundwater flow, these contaminated plumes have been migrating to the northeast directly onto the Oser Site and commingling with the PCE plume originating from the Oser Site, providing significant contribution to the Oser Site contamination. With respect to the six other industries examined, Buzea concludes, based on various reports and documents, that these companies are a major contributor to the groundwater contamination in the area and to the contamination detected beneath the Oser Site but because of the lapse of time, a precise allocation of responsibility for these other off site contaminants is not possible.

Buzea uses two groundwater models to assist in estimating the contaminant contribution from the Pall Site to the Oser Site. First, Buzea uses the Quick Domenico fate and transport model ("QD model")[3] and concludes that Pall contributed twenty percent of the contamination on-site. He then uses contaminant mass calculations and concludes that Pall's contaminant contribution to the Oser Site was twenty-two percent.

The QD model evaluates the spatial distribution and concentrations of contaminants over time based on a series of values and parameters. According to Buzea, a wide range of data and factors were used to select the values including historical data for both sites, Oser Site specific

---

[3]In selecting and applying the QD Model, Buzea worked with Will Avery ("Avery"), a specialist in groundwater modeling. Avery has experience in the area of fate and transport modeling and holds a Masters of Science in Hydrogeology and a Masters of Science and engineering in Management of Technology. He has fifteen years of modeling experience and extensive experience in field investigations of contamination and source evaluation.

factors such as soil porosity and composition, and, in the absence of site-specific data, standard literature sources and government guidance documents wherein parameter values are published. In using the QD model, Buzea did not calibrate it because, he explains, there was insufficient data to do so.   Calibration is the adjustment of parameters of a model's geometry or input parameter values in an effort to match model outputs to observed conditions.  Buzea maintains that the model remains an important tool to evaluate the fate and transport of contaminants in groundwater specifically because of the failure by Plaintiff, Pall and others, to collect sufficient groundwater samples by which the two sites may be fully characterized.

The second model used by Buzea is the mass contaminant model which, he maintains, is a method relied upon by governmental entities and private parties in evaluating subsurface contamination and in evaluating its sources.  The calculations were made by determining the total volume of contaminated groundwater in the specified geographic area, utilizing an estimated depth of contamination within the plumes.  In order to account for the volume of soil within the area, the volume was then multiplied by the soil porosity, with the resulting number representing the volume of water and contamination.  The concentration of contamination was then determined from samples taken from wells within the geographic area and multiplied into mass calculations in order to determine the volume of contaminants, isolated from groundwater.  The calculation was performed separately for the Pall plumes and the Oser Site.  The values for the plumes were based on historic site investigations, the contaminations concentration being based on a two year average for eleven monitoring wells within the plume.  The average contamination concentration for the Oser Site was based on the highest detected concentration of PCE, resulting, per Buzea, in an inherent understatement of Pall's contribution to the Oser Site.

After use of the QD and mass contaminant models, Buzea undertakes an analysis of the so-called "Gore factors"[4] to determine the portion of the response costs for which the parties should be held liable. The Gore factors are equitable factors used by the courts in CERCLA contribution cases to allocate response costs among liable parties. *See generally Environ. Transp. Sys. v. ENSCO, Inc.*, 969 F.2d 503, 508 (7th Cir. 1990). The factors include, among other things: (1) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished; (2) the amount of hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of the hazardous waste; (5) the degree of care exercised by parties with respect to the hazardous waste concerned taking into account the characteristics of such waste; and (6) the degree of cooperation of the parties with federal, state, or local authorities to prevent any harm to the public health or environment. Based on his consideration of these equitable factors Buzea opines that Pall should be liable for 23% of the contamination to the Oser Site and the remaining 77% should be allocated to Plaintiff.

It is Buzea's use of the QD model and the mass contaminant calculations, as well as his Gore factor opinion, that form the basis for Pall's *Daubert* challenge.

## III. Pall's Contentions as to Buzea

Pall summarizes its argument that Buzea's opinions are unscientific and unreliable and

---

[4] The Gore factors are so named because they are derived from the amendment that then-Representative Gore introduced in 1980 to alleviate the harshness of mandatory apportionment which was at that time a part of the bill. *See* 126 Cong. Rec. 26782 (1980) (statement of Rep. Gore).

therefore should not be admitted as follows:

- The contaminant fate and transport model he used was not calibrated and its predictions were completely inconsistent with data actually collected from the Site.

- Buzea's use of the contaminant fate and transport model is based on faulty assumptions.

- Buzea's calculation of the mass of contaminants supposedly contributed by Pall is based upon assumptions that make no sense, assumes an area of contamination of uniform concentration that simply cannot be defended and has multiple mistakes.

- The opinions on equitable allocation, based on the Gore factors, are completely subjective and untestable, and usurp the court's function.

Pall Corp.'s Mem. in Supp. of Motion in Limine to Preclude Expert Testimony of Dan C. Buzea ("Pall Buzea Supp. Mem.") at 3-4. In support of the contentions regarding the QD model and the calculation of mass of contaminants, Pall submits the affidavit of its own expert, Neil M Ram, Ph.D. ("Ram").

With respect to the QD model, Ram takes issue with various parameters (assumptions) used by Buzea, and the failure to calibrate the model. Ram points to a discrepancy between the QD model predictions and "actual conditions" determined by a single 2000 sample result as evidence of QD model's unreliability in this case.[5] As to Buzea's allocation opinion based on calculation of the relative mass of contaminants, Ram argues, inter alia, that Buzea's calculation was biased because he used data collected in 1988 and 1989 as the basis of his calculation of the mass of contaminants allegedly contributed by Pall and then compared this calculation with the

---

[5] Pall does not dispute that the QD Model is commonly used and is acceptable to evaluate fate and transport, i.e. migration of groundwater contamination, in certain situations.

calculation of contaminant mass associated with the Oser Site plume based on data obtained in 2000 and 2001, failing to account for the attenuation of contamination over the ten year period. Ram also criticizes the area used to calculate the volume of contaminants contributed by Pall and contends that the calculation of Pall's proportion did not use the correct variables.

With respect to Buzea's allocating costs based on his evaluation of the Gore factors, Pall argues that while "[e]xpert testimony might illuminate the court's consideration of equitable factors, . . . balancing those factors to arrive at an equitable allocation is an essentially judicial function." Pall Buzea Supp. Mem. at 15. Additionally, Pall argues that this testimony violates *Daubert* in that (1) there is no recognized professional discipline in the area of equitable allocation; (2) there is an inability to test the opinion; (3) there is no identifiable error rate or standard; (4) it is not based on reliable data; and (5) it ignored relevant information.

### IV. *Application of Relevant Legal Principles to Buzea*

The Court finds that Buzea's professional education and experience and his use of the QD model and mass contaminant calculations satisfy the requirements of *Daubert* and Federal Rule of Evidence 702. Based on the materials submitted to the Court, although some of the issues presented are close, Buzea's testimony is neither speculative or conjectural or based on assumptions that are so unreasonable and contradictory as to suggest bad faith. *See Boucher,* 73 F.3d at 21. Challenges to his assumptions or conclusions go to the weight of the evidence, not the admissibility. *See McCullock*, 61 F.3d at 1043. Accordingly, the motion in limine as to Buzea is denied insofar as to the QD model and the mass contaminant calculations.

Buzea's testimony on the Gore equitable factors, is however, another matter.

[A]n expert is not permitted to provide legal opinions [or] legal

> conclusions . . .; those roles fall solely within the province of the court. *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992) (citing *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509-510 (2d Cir. 1977)); *see also TC Sys. [Inc. v. Town of Colonie, New York]*, 213 F. Supp. 2d [171,] 181 [(N.D.N.Y. 2002)] ("It is well established within this Circuit that expert testimony cannot 'usurp the role of the trial judge in instructing the factfinder as to the applicable law' . . . and may not give testimony stating ultimate legal conclusions based upon the facts.") (citing, *inter alia, United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

*Randout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004).

"CERCLA's allocation scheme is an equitable determination, in which the district court must make its own factual findings and legal conclusions." *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 938 (8th Cir. 1995). Under CERCLA, "[i]n resolving contribution claims, the courts may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1); *see B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1206 (2d Cir. 1992) (stating court may consider an array of factors, including the financial resources of the parties involved).

Buzea's proposed testimony as to cost allocation based on the Gore factors violates the precept precluding an expert from stating ultimate legal conclusions based upon facts. As Pall aptly states, while "[e]xpert testimony might illuminate the court's consideration of equitable factors, . . . balancing those factors to arrive at an equitable allocation is an essentially judicial function." Pall Buzea Supp. Mem. at 15. In addition, Buzea would appear to have no qualifications, either by way of knowledge, skill, experience, training or education, as an expert in equitable allocation, assuming such an area of expertise exists. Accordingly, the motion in limine is granted insofar as Buzea's testimony on allocation based on the Gore factors and said

testimony shall be precluded at trial. *Accord New York v. Westwood Squibb Pharm. Co.*, 2001 U.S. Dist. Lexis 11765 at *18-32 (W.D.N.Y. June 23, 2001) (excluding expert testimony on CERCLA allocation based on equitable factors).

## V.  The Pease Testimony

### A.  Pease's Qualifications

Pease is a professional engineer in the State of New York and the Commonwealth of Pennsylvania.  He holds a Bachelor of Science in Physics, a Masters of Science, as well as a PhD.  His professional experience includes over thirty years of evaluating environmental conditions through science and engineering studies, assessing environmental impacts and mitigating impacts of contaminants in soil, sediment, surface and groundwater, including substantial work in the same geologic and hydrologic conditions as occur at the Oser Site.

### B.  The Nature of Pease's Testimony

Pease begins his report with a description of the four contaminants at issue and how they migrate through the soil and groundwater and act as a source of VOC vapors above a groundwater plume.  He then turns to the operation and conditions at the Oser Site.

Pease first examines operation and conditions during Vanderbilt's ownership.  Based on his review of certain records, Pease concludes that waste containing PCE was routinely discharged to sumps, roof drains, and cesspools, all of which discharged directly to the soil.  He then turns to the operations and conditions during Chitayat's operation of the Oser Site.  He concludes that Chitayat's operation did not use PCE, except in trace quantities as a constituent of a cleaner known as Safety Kleen.  He notes how Chitayat agreed to allow Pall to sample the groundwater beneath the Oser Site and then describes the results of the samples collected from

14

the monitoring wells.  Groundwater at the Oser Site revealed the presence of all four contaminants, which were also detected in the groundwater from the Pall site upgradient of the Oser Site.  Concentrations of carbon tetrachloride decreased as groundwater flowed beneath the Oser Site, while concentrations of PCE increased beneath the Oser Site.  According to Pease, given the absence of documented PCE use by Anorad, the source of the PCE present on the Oser Site was Vanderbilt's tenant.

Pease then goes on to describe the work of FPM including its Soil Investigation Report, Remedial Investigation Report, proposed Interim Remedial Measures and clean-up cost estimate.  Continuing, Pease describes NYSDEC's remedial response actions, including its designation of the Oser Site, the soil and groundwater beneath the Oser Site, and 90 and 110 Oser Avenue as Operable Unit 1 ("OU 1"), and its designation of the off-site contamination, including the plume area as it leaves the Oser Site and down gradient wetlands, a creek and New Mill Pond to the northeast, as Operable Unit 2 ("OU 2").

Based on his analysis of conditions at the Oser Site, Pease concludes that the operations of Vanderbilt's tenant resulted in extensive and significant site contamination including soil, groundwater and vapors and that the Pall plume contributed an estimated 5% to 10% to the PCE contamination of groundwater at the Oser Site.

Pease then turns to the Pall Site, its operations, the discovery of contamination and investigations.   Among other things, Pease describes an Initial Soil Sampling Survey Report prepared for Pall in April 1988 investigating a spill of 60% toluene, 35% methacrylic acid, 5% carbon tetrachloride, and trace methylene chloride.  He states "[a]pproximately 3,500 gallons of this mixture were discharged between January 28, 1988 and March 11, 1988."   According to

Pease, concentrations of the four contaminants increased dramatically after the 1988 spill, although prior to the reported spill the concentrations of these constituents had already begun to increase, apparently from other releases. According to Pease, a number of discharges to outfalls and spills of VOCs contaminated the soil and groundwater at the Pall Site and, given the groundwater flow, the concentration of PCE in groundwater from the Pall Site is between 5% and 10 % of the concentrations on the Oser Site while the concentration of the other three contaminants at the Oser Site are entirely attributable to migration from the Pall Site.

Next, Pease turns to the costs incurred and the issue of compliance with NCP requirements. Starting with the work performed by FPM, Pease opines that it conforms to industry standards and was reasonable and necessary. Accordingly, he concludes that the "costs to Chitayat for FPM's services . . . meet the conditions of the NCP for cost recovery and should be reimbursed.' Pease then goes on to examine the NYSDEC $8,000,000.00 cost estimates for remediation of OU 1 and OU 2. Finding those estimates too low, Pease estimates remedial costs of $12,000,000.00. He then concludes that the "response activities of NYSDEC are defined to be compliant with the NCP since they are being performed by a governmental agency."

Pease concludes his report with the opinion that Vanderbilt is 95% responsible for the Site Contaminant and Pall is 5% responsible.

## VI. Pall's Contentions

Pall's motion to exclude Pease's testimony is directed to the following three opinions: (1) "that Pall is liable for off-site contamination located downgradient of the Site in an area designated by the DEC as Operable Unit 2 ("OU 2");" (2) "that costs allegedly incurred by Chitayat (and the DEC) are consistent with the National Contingency Plan ("NCP")"; and (3)

16

"that Pall discharged at least 3,500 gallons of waste solvents to the environment from an overflow tank in 1988." Pall Corp.'s Mem. in Supp. of Motion in Limine To Preclude Certain Testimony of Thomas E. Pease ("Pall Pease Supp. Mem.") at 1.

With respect to Pease's opinion that Pall is liable for off-site contamination at OU 2, Pall argues that Pease's testimony that, based on groundwater results, some of the PCE in OU 2 originated from Pall lacks a reliable foundation because the three "signature" contaminants of Pall[6] are absent from any of the groundwater data for OU 2.

Pall argues that Pease's opinion that the costs allegedly incurred by Chitayat and the DEC are consistent with the NCP is not based on sufficient facts or data and is unreliable. Pall points to the fact that Pease only reviewed estimates and projections and did not review any detailed information regarding actual expenditures for specific work performed. Also, Pall points to the fact that Pease's conclusion that Chitayat's costs for certain consultant service ("FPM services") meet NCP requirements for cost recovery and should be reimbursed is without any basis as Chitayat's testimony, as well as document produced by him, demonstrate that the costs for FPM services were paid by Anorad Corporation and not Chitayat.

Pall's third challenge to Pease's testimony is that his opinion that Pall discharged 3,500 gallons of waste solvents is speculative because it is not based on any evidence in this case but from his experience at other spill sites and therefore is nothing more than unbridled speculation.

## VII. Application of Relevant Legal Principles to Pease

Pall's objections to Pease's testimony that the costs incurred by Chitayat are consistent

---

[6] According to Pease, methylene chloride, toluene, and carbon tetrachloride in the groundwater at the Oser Site are solely attributed to Pall.

with the NCP are well taken. Pease's conclusion that the "costs to Chitayat for FPM's services

therefore meet the conditions of NCP for cost recovery and should be reimbursed," [Pease Report

at ¶ 144], suffers from a fatal flaw. It is not, as Plaintiff argues, a matter of whether the record

evidence of FPM's investigation of the Site, identification of the contaminant levels, presentation

of remedial alternatives and estimates of their costs supports Pease's conclusion. Plaintiff

misconstrues Pall's point. It appears uncontroverted that the cost for FPM's services were paid

for by Anorad Corporation, not Chitayat, and therefore are not reimbursable to Chitayat.

Accordingly, the Court will exclude Pease from testifying that the costs for FPM's services are

reimbursable to Chitayat. *See Tyger Constr. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 143 (4th

Cir. 1994) (holding it was error to admit opinion that was contrary to uncontradicted evidence).

Pease's testimony that the costs for NYSDEC work are NCP compliant will similarly be

excluded. There is no evidence that Pease examined anything other than estimates and

projections. His failure to review any detailed information regarding actual expenditures for

specific work performed renders his opinion as one based solely on speculation and conjecture.

Moreover, the Court finds his opinion on NCP compliance is conclusory and excludable on that

basis. *See New York v. Solvent Chem. Co.*, 225 F. Supp. 2d 270, 285-286 (W.D.N.Y. 2002)

(citing *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001)).

Plaintiff's argument that his conclusion that the investigation and remediation chosen by DEC is

not inconsistent with the NCP is justified as a "matter of law" does not save this testimony.

Pease is simply not qualified to render such an expert legal opinion. Even if Plaintiff is correct

that the NCP consistency requirement is satisfied as a matter of law "where a CERCLA response

involves a state environmental agency charged with approving cleanup plans and monitoring the

remediation process," [Plaintiff Br. in Opp. to Pall Corp.'s Motion to Preclude at 8-9],[7] Pease's

opinion would be excluded.  In that event, Plaintiff could satisfy its burden of establishing that

the costs and response actions conform to the NCP by putting forth evidence that the response

involved a state environmental agency charged with approving cleanup plans and monitoring the

remediation process.

Pall's challenge to Pease's opinion that Pall discharged 3,500 gallons of waste solvents as

speculative presents a close question.  It is certainly permissible for experts to draw on their

experience to extrapolate from the facts and come to an opinion.  *See Zerega Ave. Realty Corp.*

*v. Hanover Ins. Co.*, 2006 U.S. Dist.  Lexis 30034 (S.D.N.Y. May 17, 2006) ("Drawing upon

one's educational background and practical experience is a reliable methodology through which

to develop opinions and reach conclusions about a scientific, technical or other area of

specialized knowledge.").  It is undisputed that there was a spill.  While Pall maintains that only

750 gallons were released to the environment, as Pease noted in his deposition testimony, the

records could support an inference that there was some degree of spillage before Pall suddenly

began taking "stick" measurements.  That, together with Pease's experience that ninety percent of

the time the actual amount of the material spilled is more than what can accurately be accounted

for immediately after the spill occurs, provides support for Pease's opinion as to the amount of

the spill.  His opinion is not devoid of factual reference or reasoning and therefore this portion of

---

[7] *But cf. Bedford Affiliates v. Sills,* 156 F.3d 416, 428 (2d Cir. 1998) (stating that significant state involvement may satisfy the public notice/comment provision of NCP).

the motion in limine will be denied.  Ultimately, the trier of fact will have to decide whether or not to accept his opinion.

The Court now turns to Pall's argument that Pease's testimony regarding the PCE in OU 2 lacks a reliable foundation.  Pall's argument is premised on the absence of the three "signature" contaminants of Pall[8] from any of the groundwater data for OU2.  While providing a fertile basis for cross-examination, the absence of the signature contaminants does not warrant exclusion of Pease's opinion.  As Pease explained during his deposition, PCE propagates and impacts the groundwater to a greater extent than at least toluene.  Pease Dep. II at 60.  Additionally, different bacteria breakdown different contaminants. *Id.*  Each of the contaminants at issue has its own propensity for absorption on soils and degradation.  *Id.* at 69.  These factors could explain the absence of the three signature contaminants from any of the groundwater data for OU 2.  Accordingly, it cannot be said Pease's opinion regarding OU 2 lacks any reliable foundation.  The motion in limine regarding OU 2 is denied.

### *Conclusion*

The motion to preclude the testimony of Dan Buzea is granted as to his cost allocation opinion based on the Gore factors but is otherwise denied.  The motion to preclude the testimony of Dr. Pease is granted as to his opinions that the costs for FPM's services are reimbursable to Chitayat and that the costs for NYSDEC work are NCP compliant, but is otherwise denied.  As discussed herein, some of the issues raised in these motions present close questions.  Also, the

---

[8] As noted earlier, Pease opines that methylene chloride, toluene and carbon tetrachloride in the groundwater at the Oser Site are solely attributed to Pall.

Court has greater flexibility in its gatekeeping function in this case given its role as the trier of

fact.  Accordingly, the Court shall consider requests to renew these motions during the course of

the trial.

**SO ORDERED.**

Dated: Central Islip, New York
      September 27, 2007

                                      _____
                                      Denis R, Hurley
                                      Senior District Judge.