UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANWAR CHITAYAT,

    Plaintiff,

  -against-          **MEMORANDUM & ORDER**

VANDERBILT ASSOCIATES, a Partnership,  Civil Action No.  03-5314
and BARBARA GROSS as EXECUTRIX   (DRH)(MLO)
of the ESTATE of WALTER GROSS,

    Defendants.
------------------------------------------------------------X
BARBARA GROSS as EXECUTRIX of the
ESTATE of WALTER GROSS,

    Third-Party Plaintiff,

  -against-

THOMAS F.  MANNO REVOCABLE TRUST
U/A 13th DAY OF FEBRUARY 1990,
WILDORO ASSOCIATES, CHARLES ROSE,
and ELIZABETH BOINOTT, as Administrators
of the Estate of HOWARD ROSE,

    Third-Party Defendants.
------------------------------------------------------------X
BARBARA GROSS as EXECUTRIX of the
ESTATE of WALTER GROSS,

    Third-Party Plaintiff,

  -against-

PALL CORPORATION, VANDERBILT
GENERATION L.P. and VANDERBILT
GENERATION II CORP.,

    Third-Party Defendants
------------------------------------------------------------X

**Appearances:**

**Certilman Balin Adler & Hyman, LLP**
Attorneys for Plaintiff Anwar Chitayat
90 Merrick Avenue
East Meadow, New York 11554
By:    Candace Reid Gladstone, Esq.
        James Rigano, Esq.

**Sive, Paget & Riesel, P.C.**
Attorneys for Defendant/ Third-Party Plaintiff Estate of Walter Gross
460 Park Avenue
New York, New York 10022
By:    Daniel Riesel, Esq.
        Dan Chorost, Esq.
        Ashley Miller, Esq.

**Tannenbaum Helpern Syracuse & Hirschtritt**
Attorneys for Defendant Vanderbilt Associates and Third-Party Defendant Wildoro Associates
900 Third Avenue
New York, New York, 10022
By:    John-Patrick Stiles Curran, Esq.

**Wilmer Cutler Pickering Hale and Dorr LLP**
Attorneys for Third-Party Defendant Estate of Howard Rose
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
By:    Daniel H.  Squire, Esq.

**Bond, Schoeneck & King, PLLC**
Attorneys for Third-Party Defendant Pall Corporation
One Lincoln Center
Syracuse, New York 13202
       and
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
By:    Thomas R.  Smith, Esq.
        Robert R.  Tyson, Esq.
        James P.  Clark, Esq.

**Cahn and Cahn, LLP**
Attorneys for Defendant Thomas F. Manno Revocable Trust U/A 13th Day of February 1990
445 Broadhollow Road, Suite 332
Melville, New York 11747
By:    Richard C. Cahn, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Anwar Chitayat ("Plaintiff" or "Chitayat") commenced this action against Vanderbilt Associates ("Vanderbilt") and Walter Gross ("Gross") in 2003 pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., as well as state law,[1] seeking to recover response costs incurred in the remediation of tetrachloroethene ("PCE") and other contaminants at and emanating from 100 Oser Avenue, Hauppauge, New York (the "Site"). The Site is located within the Hauppauge Industrial Park and occupies approximately two acres of land.

Gross, one of Vanderbilt's general partners, thereafter commenced two third-party actions. One third-party action was commenced against Vanderbilt's three other partners: the Thomas F. Manno Revocable Trust U/A 13th Day of February 1990 (the "Manno Trust"), Wildoro Associates ("Wildoro") and Howard Rose ("Rose"). The second third-party action was commenced against Pall Corporation ("Pall"), Vanderbilt Generation, L.P. and Vanderbilt Generation II Corp.

Presently before the Court are motions (1) by Vanderbilt for summary judgment against Plaintiff (Dkt. No. 126); (2) by Pall for summary judgment against Plaintiff, as well as on the claims in the Third-Party Complaint (Dkt. No. 127); (3) by Gross, Wildoro, and Rose for summary judgment against Plaintiff (Dkt. No. 128) ; and (4) by Manno Trust for summary judgment against Plaintiff, or in the alternative for summary judgment dismissing the Third-Party Complaint (Dkt. No. 142). For the reasons set forth below, the motions for summary judgment

---

[1] The amended complaint asserts a claim for joint and several cost recovery pursuant to § 107 of CERCLA, a claim for contribution pursuant to § 113(f) of CERCLA, a declaratory judgment claim under CERCLA, and a claim under state law for restitution.

against Plaintiff are granted.

## Factual Background

The following facts are undisputed unless otherwise noted:

Vanderbilt was created in 1966 as a partnership of four individuals: Gross, William D. Rechler, Thomas Manno and Rose. Gross and Rose both died during the pendency of the instant action and their personal representatives have been substituted in their place.[2] The Manno Trust became a general partner of Vanderbilt in or about July 1990 when Thomas Manno requested that the name of ownership be changed to the Manno Trust.[3] Wildoro is a New York general partnership which became a 25% general partner of Vanderbilt in or about December 1974 when William D. Rechler transferred his partnership interest to Wildoro.

Pall owns and occupies the property located at the corner of 225 Marcus Boulevard and

---

[2] Under the terms of the partnership agreement, "[i]n the event of the death of any of the parties hereto this partnership shall continue without interruption and the personal representative of the estate of such deceased party shall succeed to the interest of the deceased party." The Court notes that while Gross, Rose and Wildoro assert that Vanderbilt ceased conducting business or was dissolved in 1995, Plaintiff asserts that there is no evidence that Vanderbilt was, in fact, ever dissolved.

[3] A letter from Manno's attorney requesting the change states: "Thomas Manno is the sole beneficiary of the trust thus the change in title is nominal only, not substantive." Under the terms of the trust, Manno reserved to himself the right to revoke the Trust at any time for any reason. The assets in the Trust were to be such assets as he conveyed to the Trust from time to time. He also reserved the right to remove assets from the Trust at will. On April 11, 1995, Manno caused the Trust to convey its entire interest in Vanderbilt to Vanderbilt Generation L.P., an unrelated entity. The proceeds of the sale were paid over to Manno, individually, or to Huntington Town House, Inc., a corporation in which he was the sole shareholder.

Oser Avenue (the "Pall Property").[4]  The Pall Property is upgradient[5] of the Site.  According to

Chitayat, Pall and its predecessor manufactured battery and other membrane products at the Pall

Property.  Pall used toluene, carbon tetrachloride, methacrylic acid and methylene chloride, as

well as Safety Kleen, which has a trace amount of PCE; Pall also leased a portion of its facility to

several tenants who may have used PCE.  Investigations performed by Pall's consultants revealed

PCE in outfalls located at the side of Pall's facility furthest away from the Site.

Vanderbilt acquired the Site in 1971.  From at least 1981 until 1985, Vanderbilt leased

the Site to Sands Textile Finishers, Inc. ("Sands").[6]  Sands was a textile manufacturing and

finishing operation that used chlorinated solvents for cleaning fabrics, which included PCE as

well as other volatile organic substances ("VOCS").  To the extent there was any release of

contamination at the Site during the period of ownership by Vanderbilt, the contamination was

released by Sands.  No contamination was released on-Site or elsewhere by Vanderbilt.

On June 17, 1985 Chitayat entered into a contract with Vanderbilt to buy the property.

Prior to entering into that contract, on or about May 1, 1985 Chitayat's consultant received a

letter from the Suffolk County Department of Health Services ("SCDOH") informing him that

testing revealed contamination in the septic system on the Site.  According to the letter, "These

high levels of contamination present a threat to groundwater.  The department recommends that

---

[4] In September 1988, Pall acquired RAI Research Corporation, which had been located at the Pall Property since 1970.  Title to the Pall Property was transferred to Pall in 1989.

[5] In hydrogeologic terms, an upgradient location is related to the direction of groundwater movement.  Groundwater generally moves in the subsurface from outside a site ("upgradient") flowing beneath a site, and then eventually flows away from the site ("downgradient").

[6] Although Vanderbilt admits leasing the Site to Sands "from at least 1981 until 1985," there are documents which reflect that Sands occupied the Site at least as early as 1975.

[the cesspool] be pumped by a licensed industrial scavenger as soon as possible."  The contents

of the SCDOH's letter were sent to Chitayat by his consultant the next day.  The contract of sale

provided that Vanderbilt would clean up the hazardous substances from the septic system at the

Site to the satisfaction of the SCDHS prior to transfer of title to Chitayat.[7]    Both the contract of

sale and the Rider thereto contain an "as is" clause.  The contractual provision reads: "The

purchaser has inspected the buildings standing on said premises and is thoroughly acquainted

with their condition and subject to reasonable use, wear, tear, and natural deterioration between

the date hereof and the closing of title."  The rider provides that the "premises are sold and are to

be conveyed subject to . . . [a]ll building, subdivision, land sales, securities, ecology,

environmental protection and like laws, ordinances, rules and regulations of governmental

authorities . . . ."  It further provides:

> Purchaser affirms that, except as expressly provided for in this
> agreement, seller has not made [n]or has purchaser relied upon any
> representation, warranty, or promise with respect to the subject
> matter of this agreement, including, without limitation, any
> warranties or representations, express or implied, as to the value,
> use, tax status, or physical condition of the premises, equipment or
> property, or any part thereof, repairs thereto . . . or any other matter
> or thing relating to the premises.  Purchaser has had an opportunity
> to investigate the premises and such other matters it has deemed
> necessary or appropriate.  Without limiting the generality of the
> foregoing, purchaser has examined the premises and agrees to
> accept them in "as is" condition and in their present condition,
> subject to those matters herein specified.  In any event, the
> acceptance by purchaser of a deed conveying the premises shall
> constitute an acknowledgment by purchaser that all obligations of
> seller in respect of the premises or otherwise set forth in this
> agreement have been discharged in full; and upon such acceptance,
> the seller shall be released from any and all obligations by reason

---

[7] According to a letter dated August 29, 1985, the contamination was cleaned up to the
satisfaction of the SCDHS.

> of this agreement, except only such obligations, if any, as are
> pursuant to the express provisions of this agreement to survive the
> delivery of the deed or the closing of title hereunder.

Pursuant to the contract of sale, Vanderbilt conveyed its interest in the Site to Chitayat on

September 30, 1985.

At the time Chitayat purchased the Site, he also owned 110 Oser Avenue and the Anorad

Corporation ("Anorad").  Anorad manufactured precision motion machinery for the automation

industry and was located at 110 Oser Avenue beginning in or about 1980.  Anorad expanded its

operations into the building at the Site in or about 1986 after Chitayat renovated the building.

Anorad used the Site mainly as a warehouse, as well as for software and research and

development personnel, its accounting department and certain executive offices.  For a short time

Anorad also used the Site for the manufacture of small linear motors, the assembly of PC boards,

and the use of a wave soldering machine.[8]

According to Chitayat, he first became aware of contamination at the Site in 1989.  Pall

had a spill of hazardous substance on the southwest side of its property in March 1988 and

Chitayat was informed that Pall retained Donnelly Engineering to respond to the spill.  In 1989,

Donnelly Engineering, with Chitayat's permission, placed three wells on the west side of the

building at the Site in order to test the groundwater downgradient to find out if the hazardous

substances had migrated onto the Site from the Pall Property.[9]  Samples from these wells

revealed elevated concentrations of PCE at the Site.  Chitayat then retained the environmental

---

[8]  Defendants' contend that Anorad's use caused, at least in part, some of the
contamination problem at the Site.  Chitayat disputes this contention.

[9]  According to some of the defendants, Fanning Phillips and Molner ("FPM"), a
consultant firm hired by Chitayat, drilled these wells.

consulting firm of Fanning Phillips & Molnar (FPM") to investigate the contamination for

purposes of remediation.[10]  According to Chitayat, while FPM investigated the contamination

and proposed alternative remediation measures, none of these measures were implemented

because the DEC took over the investigation and remediation of the contamination.  According

to defendants, FPM began construction of a soil vapor extraction system at the Site.

On August 28, 1998, Chitayat entered into an administrative order on consent (the

"Consent Order") with the New York State Department of Environmental Conservation ("DEC")

regarding the Site.  The Consent Order recites that it is "issued pursuant to the Department's

authority under, *inter alia*, ECL Article 27, Title 13 and ECL3-0301 and constitutes an

administrative settlement for purposes of 42 USC 9613(f), with the investigation and remediation

of contamination existing on the Site as of the effective date of this Order being the matter

addressed by such settlement."  The Consent Order provides, inter alia, that Chitayat is to make

payments to the DEC for expenses it incurred in the investigation and remediation of the Site,

---

[10]  There is a question of fact as to whether FPM was hired by Chitayat or Anorad.   It is
not disputed that certain costs associated with the Site were paid by Anorad and that Chitayat did
not reimburse Anorad for these costs.   Defendants contend in their 56.1 Statement  that "[t]he
costs incurred by Anorad Corporation and/or Chitayat for Site investigation were incurred prior
to the execution of the Consent Order.  (Pall. Corp.'s Marked 56.1 (Docket No. 158) at ¶ 14.)
Chitayat disputes that contention and contends that he incurred costs both prior to and after the
execution of the Consent Order. (*Id.*)  As support for this contention he cites his affidavit wherein
he states that he has "personally paid in excess of $800,000.00 in connection with the
investigation and remediation of the Site."  Chitayat Aff. at ¶ 18.  The affidavit does not refer to
any specific documents.  Chitayat's 56.1 contention cites an Exhibit consisting of (1) a Cost
Summary of expenditures incurred by New York State for its remedial activities showing, inter
alia, in excess of $30,000 paid for a billing period of 4/3/96 to 5/31/99; (2) checks from Chitayat
to the DEC dated during 2001, 2003 and 2006; and (3) a series of documents entitled "FRM
Group AR Transaction Record" for "Client: [180] Anorad Corporation" (brackets in original).
While these documents make clear that Chitayat personally expended money related to response
after the Consent Order, they provide no evidence that he personally (as opposed to Anorad)
expended such money prior to the Consent Order.

with the payments in any one year not to exceed $125,000.00. "Upon the [DEC's] receipt of the

last payment by [Chitayat] . . . and the [DEC's] acknowledgment that it has received in full all of

the State's costs incurred concerning the Site . . ., the [DEC's] acknowledgment shall constitute a

full and complete release for each and every claim, demand, remedy or action whatsoever against

[Chitayat], [and] the Anorad Corporation . . . which the [DEC] has or may have pursuant to . . .

the Comprehensive Environmental Response, Compensation and Liability Act of 1980 . . .

relative to or arising from the disposal of hazardous waste at the Site that occurred on or before

the effective date of this Order. . . ." The Consent Order also provides:

> The provisions of this Order do not constitute and shall not be
> deemed a waiver of any right [Chitayat] otherwise may have to
> seek and obtain contribution and/or indemnification from other
> potentially responsible parties . . . for payments made previously or
> in the future for response costs. To the extent authorized under 42
> USC 9613 or any other applicable law [Chitayat] shall not be liable
> for any claim, now or in the future, in the nature of contribution by
> potentially responsible parties concerning contamination existing
> on the Site as of the effective at of this Order. In any future action
> brought by [Chitayat] against a potentially responsible party under
> [CERCLA] the provisions of 42 USC 9613(f)(3) shall apply.

After execution of the Consent Order, all site investigation and remediation were

undertaken by the DEC or its contractors, not by Chitayat. While Pall contends that the DEC did

not rely upon the site investigation undertaken by Anorad Corporation and/or Chitayat as the

basis for its selection of a remedy, Chitayat contends that the DEC specifically referred to a

number of FPM investigations and reports.

Additional facts shall be put forth as pertinent to the discussion at hand.

## Discussion

## I.  Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law.  *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir. 2008); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see SCR Joint Venture L.P. v.* Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *See SCR Joint Venture*, 559 F.3d at 137; *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

## II.  The Defendants' Contentions

Pall maintains that it is entitled to summary judgment on the following grounds: (1) Chitayat has no § 107(a) claim because he has not implemented remedial actions himself but rather is obligated to reimburse the DEC; (2) Chitayat may not maintain a § 113(f)(3)(B) claim because (a) the Consent Order was not entered under the authority of CERCLA and does not

resolve CERCLA claims and therefore cannot serve as a predicate for such a contribution claim, and (b) the claim is time-barred under the three year statute of limitations applicable to contribution actions; and (3) Chitayat does not have a valid claim for response costs incurred prior to the Consent Order because any such claim is barred by the statute of limitations and because those costs were incurred by Anorad and not Chitayat; and (4) the claim for restitution is pre-empted by CERCLA.

Gross, Rose and Wildoro assert the grounds raised by Pall and also claim they are entitled to summary judgment because Chitayat expressly assumed future CERCLA liability.

Manno Trust, in addition to adopting the arguments of Pall, maintains it cannot be held liable for any of Vanderbilt's obligations arising out of conduct that occurred before its admission to the partnership.

### III.  CERCLA Liability

"CERCLA is a comprehensive federal law governing the remediation of sites contaminated with pollutants."  *Consol. Edison Co. of N.Y. v. UGI Utilities,Inc.*, 423 F.3d 90, 94 (2d Cir. 2005).  Congress enacted CERCLA for the purpose of ensuring "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions."  S. Rep. No. 848, 96th Cong., 2d Sess. 13 (1980).  Its goals include "encouraging the timely cleanup of hazardous waste sites and placing the cost of that cleanup on those responsible for creating or maintaining the hazardous condition."  *Consol. Edison*, 423 F.3d at 94 (internal quotations and brackets omitted); *accord Burlington N. & Santa Fe Ry. Co. v. U.S.*, 129 S. Ct. 1987, 1874 (2009).  In support of these goals, CERCLA contains provisions which allow for two distinct remedies for the recoupment or reimbursement for cleanup and prevention costs at

contaminated sites.  *See id.*  Section 107(a) allows for cost recovery actions by the government

and private parties against potentially responsible parties ("PRPs").  42 U.S.C. §§ 9607(a); *see*

*Schaefer v. Town of Victor*, 457 F.3d 188, 194 (2d Cir. 2006).  Sections 113(f)(1) and

113(f)(3)(B) allow for contribution actions.  42 U.S.C. § 9613(f).  *see Schaefer*, 457 F.3d at 194.

Only sections 107(a) and 113(f)(3)(B) are at issue in the instant matter.[11]

### A.  Section 107(a) Cost Recovery Claims

"CERCLA imposes strict liability for environmental contamination upon four broad

classes of PRPs."  *Burlington N. & Santa Fe Ry.*, 129 S. Ct. at 1878.   These classes are:

> (1) the owner and operator of a vessel or facility, (2) any person
> who at the time of disposal of any hazardous substance owned or
> operated any facility at which such hazardous substances were
> disposed of, (3) any person who by contract or agreement, or
> otherwise arranged for disposal or treatment, or arranged with a
> transporter for transport for disposal or treatment, of hazardous
> substances owned or possessed by such person, by any other party
> or entity at any facility or incineration vessel owned or operated by
> another party or entity and containing such hazardous substances,
> and (4) any person who accepts or accepted any hazardous
> substances for transport to disposal or treatment facilities,
> incineration vessels or sites selected by such person, from which
> there is a release, or a threatened release which causes the
> incurrence of response costs, of a hazardous substance . . . .

42 U.S.C. § 9607(a).  PRPs are liable for "(A) all costs of removal or remedial action incurred by

the United States Government or a State or an Indian tribe not inconsistent with the national

contingency plan; (B) any other necessary costs of response incurred by any other person

consistent with the national contingency plan; (C) damages for injury to, destruction of, or loss of

---

[11] Chitayat has advised the Court that he is not pursuing a § 113(f)(1) claim in light of the Supreme Court's decision in *Cooper Industries Inc. v. Aviall Serv. Inc.*, 543 U.S. 157 (2004). (*See* Pl.'s Br. in Opp. at 17 n.13.)  In *Cooper Industries*, the Court held that a prior § 106 or 107 action is a prerequisite to a § 113(f)(1) action.

natural resources . . . , and (D) the costs of any health assessment or health effects study . . . ."

*Id.*

In *United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007), the Court held that

under § 107(a) a PRP who has incurred costs of response in cleaning a contaminated site has a

cause of action to recover those costs from other PRPs.   In the Court's words, "§ 107(a) permits

a PRP to recover only costs it has 'incurred' in cleaning up a site.  When a party pays to satisfy a

settlement agreement or a court judgment, it does not incur its own costs of response.  Rather, it

reimburses other parties for costs that those parties incurred. . . . Hence, a PRP that pays money

to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution.  But by

reimbursing response costs paid by other parties, the PRP has not incurred its own costs of

response and therefore cannot recover under § 107(a)."  551 U.S. at 139.

To the extent Chitayat's 107(a) claim seeks to recover monies Chitayat expended in

paying DEC for the costs of response incurred by the DEC, *Atlantic Research* requires its

dismissal.

Under the terms of the Consent Order, Chitayat is not required to expend his own funds

to remediate the Site.  The Consent Order provides, in relevant part:

> The Department will implement an inactive hazardous waste
> disposal site remedial program pursuant to Section 27-1313 of the
> ECL *utilizing monies from the hazardous waste remedial fund*
> established under Section 97-b of the State Finance law.  *In*
> *furtherance of the Department's obligation to make all reasonable*
> *efforts to recover any moneys expended* from the Hazardous Waste
> Remedial Fund and to attain the most practical and efficient benefit
> from the Respondent's limited financial resources and to expedite
> the environmental remediation of the Site and to fully resolve the
> recovery of the State's and Department's past and future costs for
> the Site, the Department and [Chitayat] agree that *the goal of this*

> *Order is for Respondent to make payment to the Department such*
> *sum of money as shall fully reimburse the Department's past and*
> *future claims for the recovery and/or reimbursement,* without
> interest, of lawfully incurred Site-related response costs in
> accordance with applicable law . . . .

Consent Order at p. 2-3 ¶5 (emphasis added). As the Consent Order requires Chitayat to

"reimburse" the DEC for the DEC's response costs, as opposed to requiring him to expend funds

for remediation, Chitayat cannot recover from the defendants pursuant to § 107(a) the amounts

he expended pursuant to the Consent Order.

Notwithstanding Chitayat's arguments to the contrary, that Chitayat is reimbursing the

DEC for the response costs the DEC incurred distinguishes the instant case from *W.R. Grace &*

*Co. v. Zotos Int'l*, 559 F.3d 85 (2d Cir. 2009). In *W.R. Grace*, the Court held that "the fact that a

party enters into a consent order before beginning remediation is of no legal significance with

respect to whether or not the party has incurred response costs as required under section 107(a)."

*Id.* at 92. In reaching that conclusion, the court stated:

> Under the plain language of the statute, the fact that a party enters
> into a consent order before beginning remediation is of no legal
> significance with respect to whether or not the party has incurred
> response costs as required under section 107(a). Our reliance on
> the statutory language conforms with the Supreme Court's
> emphasis on the text of CERCLA in interpreting section 107(a).
> *See e.g. Atl. Research*, 127 S. Ct. at 2336 (stating that the structural
> relationship of the text must "be read as a whole," and that the
> "*plain language of subparagraph (B) authorizes cost-recovery*
> *actions by any private party, including PRPs*" (emphasis added)).
> Indeed, the Court concluded that "[b]ecause the plain terms of §
> 107(a)(4)(B) allow a PRP to recover costs from other PRPs, the
> statute provides Atlantic Research with a cause of action." *Id.* at
> 2339. In the same manner that section 107(a) is not limited solely
> to "innocent" parties, *see id.*, section 107(a) does not specify that
> only parties who "voluntarily" remediate a site have a cause of

action.

> Section 107 "permits a PRP to recover only the costs it has 'incurred' in cleaning up a site." *Id*. at 2338 (citing 42 U.S.C. § 9607(a)(4)(B)). Section 107(a) "permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs." *Id*. A party who "pays to satisfy a settlement agreement or a court judgment," however, "does not incur its own costs of response. Rather, it reimburses other parties for costs that those parties incurred." *Id*; *see also Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 934 (9th Cir.2008) ("[A] PRP who has not been subject to a § 106 or a § 107 action ... is not entitled to seek contribution under § 113. Instead, he should proceed under § 107 for cost recovery."). Here, Grace seeks to recover costs for remediation it performed itself; it does not seek to recoup expenses incurred in satisfying a settlement agreement or a court judgment. We conclude that Grace may seek recovery for incurred response costs under section 107(a).

559 F.3d at 92-93. *See also New York v. Next Millenium Realty, LLC*, 2008 WL 1958002, *6 (E.D.N.Y. May 2, 2008) (dismissing claim pursuant to § 107(a) where claim sought to recover amounts reimbursed to another rather than necessary costs of response incurred by parties asserting claim).

Accordingly, the motion for summary judgment is granted on Chitayat's claim pursuant to § 107(a).[12]

**B. Section 113(f)(3)(B) Contribution Claim**

Section 113(f)(3)(B) provides that "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2)." 42 U.S.C. § 9613(f)(3)(B).

---

[12] As noted earlier, *supra* n.9, although Chitayat contends that he incurred costs both prior to and after the execution of the Consent Order, there is no evidence that he personally (as opposed to Anorad) expended money prior to the Consent Order.

Defendants maintain that the Consent Order did not resolve Chitayat's CERCLA liability to the State and therefore provides no basis for a § 113f(3)(B) claim. In addition, Defendants contend that any claim for contribution is time- barred.

1. The Consent Order is an Administrative Settlement within § 113(f)(3)(B)

In *Consolidated Edison Co. of New York v. UGI Utilities, Inc.*, 423 F.3d 90 (2d Cir. 2005) the Second Circuit addressed the question of whether a voluntary cleanup agreement entered into by Con Ed with the DEC was an administrative settlement that permitted a contribution action pursuant to § 113f(3)(B). The Court began its analysis with the proposition that § 113(f)(3)(B) creates a right of contribution "only when liability for CERCLA claims, rather than some broader category of legal claims, is resolved." *Id.* at 95. Proceeding from that premise, the Court went on to examine whether the voluntary cleanup agreement at issue resolved Con Ed's CERCLA liability:

> In the Voluntary Cleanup Agreement, the Department promised that if Con Ed cleaned up the properties specified in the agreement according to the agreement's terms, the Department would furnish Con Ed with a Release and Covenant Not to Sue. The Release and Covenant Not to Sue states that the Department "releases, covenants not to sue, and shall forebear from bringing any action, proceeding, or suit pursuant to the [New York] Environmental Conservation Law, the Navigation Law or the State Finance Law, and from referring to the Attorney General any claim for recovery of costs incurred by the Department ... for the further investigation and remediation of the Site, based upon the release or threatened release of Covered Contamination." This language makes clear, contrary to Con Ed's contentions, that the only liability that might some day be resolved under the Voluntary Cleanup Agreement is liability for state law-not CERCLA-claims.

> To be sure, the Voluntary Cleanup Agreement does refer to CERCLA in its "Reservation of Rights" section. There, the agreement states:

Except for the Department's right to take any investigatory or remedial action deemed necessary as a result of a significant threat resulting from the Existing Contamination or to exercise summary abatement powers, the Department shall not take any enforcement action under [Environmental Conservation Law] Article 27, Title 13, under CERCLA, under the [Navigation Law], or under comparable statutory or common law theories of remedial liability with respect to the Existing Contamination, to the extent that such contamination is being addressed under the Agreement, against Volunteer or Volunteer's grantees, successors or assigns during the implementation of this Agreement, provided such party is in compliance with the terms and provisions of this Agreement, including without limitation the requirements of all Work Plans and amendments thereto.

However, this language cannot be construed to have resolved Con Ed's CERCLA liability. In fact, the exception enunciated at the beginning of this section of the agreement-which reserves the Department's right to take action under CERCLA "deemed necessary as a result of a significant threat resulting from the Existing Contamination or to exercise summary abatement powers"-leaves open the possibility that the Department might still seek to hold Con Ed liable under CERCLA. Moreover, to the extent that this language affords Con Ed any protection at all, that protection only lasts "during the implementation of this Agreement," i.e., while Con Ed is cleaning up the designated sites. Once the cleanup is completed, the Department will apparently regain the rights relinquished in this section of the agreement, and grant Con Ed only the releases specified in the Release and Covenant Not to Sue. This language, therefore, does not in any way suggest that Con Ed resolved its liability to the Department under CERCLA.

For these reasons, we conclude that Con Ed may not pursue its action under section 113(f)(3)(B).

423 F.3d at 96-97 (footnote omitted).

In *W.R. Grace,* the Second Circuit again addressed the issue of whether a plaintiff's

consent order with the DEC "resolved its CERCLA liability," so to enable that plaintiff to pursue

a cause of action under § 113(f)(3). 559 F.3d at 90. The court concluded that as the consent order did not resolve the plaintiff's CERCLA liability, it "was not an administrative settlement cognizable under section 113(f)(3)(B)" and affirmed the lower court's decision that the plaintiff could not bring a contribution action under that section. *Id.* at 91. The *W.R. Grace* Court reasoned as follows:

> The 1988 Order on Consent provides:
>
>> If the [DEC] acknowledges that the implementation is complete ... such acknowledgment shall constitute a full and complete satisfaction and release of each and every claim, demand, remedy or action whatsoever against [Grace], its officers and directors, which the [DEC] has or may have as of the date of such acknowledgment pursuant to Article 27, Title 13, of the ECL relative to or arising from the disposal of hazardous or industrial waste at the Site.
>
> (emphasis added). The Consent Order further states: "Nothing contained in this Order shall be construed as barring, diminishing, adjudicating or in any way affecting ... (3) the [DEC's] right to bring any action, at law or in equity against [Grace] ... with respect to areas or resources that may have been damaged as a result of the release or migration of hazardous or industrial wastes from the Site." This text, which makes no reference to CERCLA, establishes that the DEC settled only its state law claims against Grace, leaving open the possibility that the DEC or the EPA could, at some future point, assert CERCLA or other claims. In the same way that the voluntary consent agreement in Consolidated Edison did not resolve Consolidated Edison's liability under CERCLA, neither did this Consent Order resolve Grace's liability under CERCLA. *See City of Waukesha v. Viacom Int'l Inc.*, 404 F. Supp. 2d 1112 (E.D.Wis.2005) (citing *Consolidated Edison* and the district court's decision in that case, and holding that the cost share pilot program contract the City entered with State's Department of Natural Resources was not an administrative or judicially approved settlement that resolved the City's CERCLA liability).
>
> The Consent Order at issue here did not resolve CERCLA claims that could be brought by the federal government. As the district

court correctly observed, "[w]here a state proceeds on its own authority to identify a remedy and settle with a PRP, there is a risk the EPA will take later actions or select different remedies that could expose the PRP to additional liabilities." Grace, 2005 WL 1076117 at *5. We conclude that the Consent Order with the DEC was not an administrative settlement cognizable under section 113(f)(3)(B) . . . .

559 F.3d at 91.

Unlike the consent orders in *Consolidated Edison* and *W.R. Grace*, Chitayat's Consent Order with the DEC does specifically refer to the resolution of Chitayat's CERCLA liability. As noted earlier, the Consent Order recites that it "constitutes an administrative settlement for purposes of 42 USC 9613(f), with the investigation and remediation of contamination existing on the Site as of the effective date of this Order being the matter addressed by such settlement." The Consent Order further provides that "[u]pon the [DEC's] receipt of the last payment by [Chitayat] . . . and the [DEC's] acknowledgment that it has received in full all of the State's costs incurred concerning the Site . . ., the [DEC's] acknowledgment shall constitute a full and complete release for each and every claim, demand, remedy or action whatsoever against [Chitayat], [and] the Anorad Corporation . . . which the [DEC] has or may have pursuant to . . . *the Comprehensive Environmental Response, Compensation and Liability Act of 1980* . . . relative to or arising from the disposal of hazardous waste at the Site that occurred on or before the effective date of this Order. . . ." (emphasis added). Finally, it states that "[i]n any future action brought by [Chitayat] against a potentially responsible party under [CERCLA] the provisions of 42 USC 9613(f)(3) shall apply."

Defendants maintain that Consent Order is not an administrative order within the meaning of § 113(f)(3) because (1) New York State never applied for or received authority from

the EPA pursuant to CERCLA § 104(d)(1)(A), *see* 42 U.S.C. § 9604(d)(1)(A), and did not

comply with certain procedural requirements for settlements set forth in § 122(d), (g) or (h); and

(2) it does not offer Chitayat a present release from liability but rather the release is contingent

upon years of Compliance with the Consent Order.  These arguments must fail in light of the

Second Circuit's recent decision in *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.,* –

F.3d –, 2010 WL 626064 (2d Cir. Feb. 24, 2010 ).[13]  In *Niagara Mohawk*, the Court found that

the consent order entered into by Niagara Mohawk resolved its CERCLA liability even in the

absence of  federal delegation of settlement authority to the NYDEC as such is not required by

§113(f)(3). *Id.* at * 6-8.   Also, that Niagara Mohawk's consent order with the NYDEC provided

for a release upon Niagara Mohawk's completion of its  responsibilities thereunder did not

prevent Niagara Mohawk's consent order from "qualif[ying] as an administrative settlement of

liability for purposes of CERCLA pursuant to the plain text of § 113(f)(3)(B)."  *Id.* at * 7.

Chitayat's Consent Order qualifies as "an administrative or judicially approved

settlement" under § 113(f)(3)(B) entitling Chitayat to seek contribution under CERCLA.

## 2.  Timeliness of the Contribution Claim

Defendants further maintain that they are entitled to summary judgment on Chitayat's

contribution claim as it barred by the statute of limitations set forth in § 113(g)(3), this action

having been commenced more than three years from the entry of the Consent Order.  Plaintiff

retorts that this action is timely because either (1) the Consent Order is not a triggering event

under the statute and therefore no statute of limitation applies or (2) CERCLA's 6 year period

---

[13] The Court notes parenthetically that pertinent provisions of Chitayat's Consent Order are nearly identical to the 2003 Consent Order provision considered by the *Niagara Mohawk* Court.

applicable to cost recovery actions applies.

CERCLA contains a six year statute of limitations for § 107(a) cost recovery actions and a three year statute of limitations for § 113 contribution claims. *See* 42 U.S.C. § 113(g)(2) & (3). With respect to § 113 contribution claims, the statute states:

> No action for contribution for any response costs or damages may be commenced more than 3 years after —
> (A) the date of judgment in any action under this chapter for recovery of such costs or damages, or
> (B) the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to costs or damages.

42 U.S.C. § 113(g)(3). The section does not expressly refer to a state administrative order.

Prior to the Supreme Court's decisions in *Cooper Industries* and *Atlantic Research Corp.*, there were three approaches taken by those courts that addressed the issue of the lack of a triggering event in § 113(g)(3) encompassing a state administrative order or a unilateral EPA order under § 106. As described by one court the three approaches were as follows:

> Under the first approach, [the court] would find that the plain language of section 113(g)(3) establishes no statute of limitations . . . . Under the second, [the court] would use the six-year statute of limitations in section 113(g)(2) . . . . Under the third, [the court] would use the three-year statute of limitations in section 113(g)(3) and import another triggering event from federal common law.

*Geraghty and Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 924 (5th Cir. 2000).

In this Court's view, the decisions in *Cooper Industries* and *Atlantic Research Corp.* eliminate the availability of the six-year statute of limitations set forth in section 113g(2) as an option for contribution cases. In *Cooper Industries*, the Court observed that §§ 107 and 113(f)

provide two "clearly distinct" remedies, with § 107 providing for a cost recovery remedy and § 113 providing for contribution. 543 U.S. § 163 n.3. The *Atlantic Research* Court further expounded:

> [T]he remedies available in §§ 107(a) and 113(f) complement each other by providing causes of action "to persons in different procedural circumstances." *Consolidated Edison*, 423 F.3d, at 99; *see also E.I. DuPont de Nemours* [*and Co. v. U.S.*], 460 F.3d [515,] 548 [3d Cir. 2006] (Sloviter, J., dissenting). Section 113(f)(1) authorizes a contribution action to PRPs with common liability stemming from an action instituted under § 106 or § 107(a). And § 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs. Hence, a PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution. But by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a). As a result, though eligible to seek contribution under § 113(f)(1), the PRP cannot simultaneously seek to recover the same expenses under § 107(a). Thus, at least in the case of reimbursement, the PRP cannot choose the 6-year statute of limitations for cost-recovery actions over the shorter limitations period for § 113(f) contribution claims.

551 U.S. at 139; *see also Niagara Mohawk,* 2010 WL 626064 at * 8 n.19 ("Claims under § 107 do enjoy a six-year statute of limitations while claims under § 113 have a three-year statute of limitations.").

    *Cooper Industries* also suggests that the conclusion that there is no statute of limitations is incorrect. As that Court noted :

> § 113 provides two express avenues for contribution: § 113(f)(1) ("during or following" specified civil actions) and § 113(f)(3)(B) (after an administrative or judicially approved settlement that resolves liability to the United States or a State). Section 113(g)(3) then provides two corresponding 3-year limitations periods for contribution actions, one beginning at the date of judgment, § 113(g)(3)(A), and one beginning at the date of settlement, §

> 113(g)(3)(B). Notably absent from § 113(g)(3) is any provision for
> starting the limitations period if a judgment or settlement never
> occurs, as is the case with a purely voluntary cleanup.

543 U.S. at 167. *See also Niagara Mohawk,* 2010 WL 626064 at * 8 n.19. ("claims under § 113

have a three-year statute of limitations."); *Schaefer*, 457 F.3d at 209 (describing benefits of

limitations period from policy perspective and rejecting proposal that would "give government

entities almost unlimited discretion as to when, or even whether, the limitations periods begins to

run" as antithetical to the purpose of statutes of limitations).

Indeed, *Cooper Industries* seems to support not only that a three year statute of

limitations applies to a contribution action based on resolution of liability to a state but that the

triggering event should be the date of the "settlement" of that liability, here the date of the

Consent Order. *See id.* ("Section 113(g)(3)(B) provides . . . 3-year limitations period for

contribution actions, one beginning on the date of judgment . . . and one beginning on the date of

settlement . . . .").  Such a conclusion comports with the rule under federal common law that it is

the discovery of the injury which triggers the statute of limitations. *Rotella v. Wood,* 528 U.S.

549, 555-57 (2000).  Here, Chitayat would have discovered his "injury" no later than the date he

entered into the Consent Order.

Accordingly, the Court concludes that Chitayat's § 113(f)(3)(B) claim is governed by a

three year statute of limitations, which period began to run, at the latest, on the date of the

Consent Order.  The Consent Order was entered into on August 28, 1998 and this action was not

commenced until October 22, 2003.  Accordingly the claim is time-barred and Defendants'

motion for summary judgment on Chitayat's § 113(f)(3)(B) is granted.

**IV.    State Common Law Restitution Claim**

Defendants seek summary judgment on Plaintiff's state law claim for restitution arguing, inter alia, that it is preempted by CERCLA.  The Court agrees.  In *Niagara Mohawk*, the Second Circuit held that state law contribution and unjust enrichment claims for CERCLA response costs conflict with CERCLA contribution claims and are therefore preempted.  2010 WL 626064 at *19.  The Court also reiterated that state law indemnification claims are preempted by CERCLA. *Id.* (citing *Bedford Affiliates*, 156 F.3d at 427).  This Court is unpersuaded that state law claims for restitution should not similarly be preempted.

## Conclusion

For the reasons set forth herein, summary judgment is granted against Plaintiff and in favor of defendants and third-party defendants (Vanderbilt, Gross, Manno Trust, Wildoro, Rose and Pall).  The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
       March 22, 2010

                              /s/_____
                              Denis R. Hurley
                              Senior District Judge